## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

STEPHANIE L. WEST,      )
                            )
          Plaintiff,      )
                            )
      v.                )     No.  09-3024
                            )
MICHAEL J. ASTRUE,     )
COMMISSIONER OF SOCIAL   )
SECURITY ADMINISTRATION,  )
                            )
         Defendant.    )

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Stephanie L. West (West) appeals from a final Decision of the Social Security Administration (SSA) denying her application for Supplemental Social Security Income (SSI) under Chapters II and XVI of the Social Security Act, 42 U.S.C. §§ 423 and 1381a.  West brings this appeal pursuant to 42 U.S.C. § 405(g).  Pursuant to Local Rule 8.1(D), West has filed a Motion for Summary Judgment (d/e 12) and Brief in Support of Plaintiff (d/e 13).  The Commissioner has filed a Motion for Summary Affirmance (d/e 16) and Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 17).

For the reasons set forth below, the Court determines that the SSA's Decision is not supported by the evidence. West's Motion for Summary Judgment is GRANTED, and the Commissioner's Motion for Summary Affirmance is DENIED. The Commissioner's Decision is REVERSED, and this case is remanded pursuant to 42 U.S.C. § 405(g), Sentence 4, for further proceedings consistent with this Opinion.

## FACTS[1]

## I.    GENERAL BACKGROUND

West is a twenty-five-year-old woman who applied for SSI on January 27, 2004, when she was nineteen years old. Social Security Transcript (Tr.) (d/e 10), 20. She attended high school through her sophomore year. Id. at 16. She has worked as a retail cashier, salesperson, general merchandise worker, fast food worker, hostess, and material handler. Id. She has a two-year-old son and lives with her parents. West has suffered from serious medical problems, both physical and mental, for years. She has diabetes mellitus and chronic pancreatitis due to a cystic fibrosis gene mutation; she also has had bouts of severe depression and anxiety attacks. Id. at 17. West

---

[1]The record in this case is nearly 2400 pages long. Accordingly, this summary of the facts is not exhaustive.

has had some episodes of illegal substance abuse, which have, by her own admission, tended to worsen her medical conditions.

Doctors diagnosed West with diabetes when she was three years old. Tr. at 126. They diagnosed her with pancreatitis when she was thirteen. Id. at 270. In 2000, doctors treated West's pancreatitis by performing a sphincterotomy and placing a stent in her pancreas. Id. at 258-70.

II. MEDICAL HISTORY PRIOR TO JANUARY 2004

Some background information before the relevant period is helpful to put West's illnesses in context. The record demonstrates that West has been treated for pancreatitis since at least 1999. Tr. at 270. In June 1999, West was hospitalized and treated for pancreatitis; her symptoms included vomiting and severe abdominal pain that radiated into her back. Id. She was hospitalized for the condition again in 2000 and 2001.

West also received psychological treatment. In September 2000, she visited Dr. John Beck at the Carle Pavilion in Champaign, Illinois. Dr. Holly Mirell, West's outpatient psychologist, referred her for treatment based on the fact that West's recent complaints of abdominal pain had not been attributable to her chronic pancreatitis; Dr. Mirell was concerned that the psychological aspects of her disease were contributing to stomach pain.

Id. at 275. West said that she felt very sad because her boyfriend had recently broken up with her, and admitted that she frequently smoked marijuana. Id. Dr. Beck relayed that West had difficulty in school and that her high school grades were suffering because of her frequent hospitalizations. Id. at 276.

In 2001, West visited Dr. James Whisenand at the Carle Pavilion. Id. at 272. She complained of depression and anxiety due to recurring episodes of pancreatitis and complications with diabetes. Id. Dr. Whisenand indicated that West was taking too much Vicodin, and that her previous bout of hospitalization due to abdominal pain was probably caused by West's inability to control her diabetes, and not by pancreatitis as had been the case in the past. Id. He assigned her a GAF score of 35 to 40.[2] Id. at 273.

In 2003, the State of Illinois Disability Determination Services had West evaluated physically and mentally. Dr. Hima Atluri performed the physical evaluation, and found that West suffered from diabetes, anxiety,

_____

[2]The Global Assessment of Functioning (GAF) scale was designed to "report[] the clinician's judgment of the individual's overall level of functioning and carrying out activities of daily living." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32-33 (4ᵗʰ Ed. 2000). A score between 31 and 40 represents "major impairment in several areas . . . ." Id. at 32-34 (d/e 17), at 7.

depression, and pancreatitis.  Id. at 282-85.  Dr. Stephen Vincent performed a psychological evaluation.  He noted that she had a long history of depression due to her severe illnesses, and that she smoked cigarettes and used to snort Ritalin to help her cope with pain.  Id. at 287-89.  Dr. Vincent diagnosed West with major depression and general anxiety disorder characterized by panic attacks.  Id. at 289.

III.   MEDICAL HISTORY AFTER JANUARY 2004

West was hospitalized at Carle Foundation Hospital in Urbana, Illinois, for three days in February 2004 with an episode of acute pancreatitis.  Tr. at 303.  The doctors noted that West "never exhibited inappropriate request[s] for narcotics," and that she only used morphine during flare ups.  Id. at 307.  After she was released from the hospital, West saw Dr. Nasreen Syed for follow-up treatment.  Id. at 301.  Dr. Syed noted that West was suffering from anxiety and depression, and that although she was taking medication for these conditions, she had stopped seeing her counselor because of financial concerns.  Id.  Dr. Syed encouraged West to be more consistent in testing her insulin levels, as noncompliance with medication for diabetes had been a problem for West.  Id. at 302.  Dr. Syed increased her dosage of Lexapro, put her on clonazepam, and tried to

arrange for her to see a psychiatrist free of cost.  Id.

In April 2004, West had another episode of acute pancreatitis and spent five more days in the hospital.  Id. at 293.  Her sugar levels were elevated, and she was experiencing extreme abdominal pain.  Id.  The doctors gave her morphine for pain and Humalog to counteract high blood sugar.  Id. at 297.  By the time she was discharged, West was in stable condition, and her pain had subsided.  Id. at 293.

Dr. Sandra Bilinsky reviewed West's medical records on behalf of the state agency in July 2004.  Id. at 596.  Dr. Bilinsky found that West could perform "light work," defined as lifting and/or carrying twenty pounds occasionally and ten pounds frequently, and sitting, standing, and/or walking for six hours in an eight-hour period.  Id. at 597.  A clinical psychologist was also supposed to evaluate West, but she failed to attend the examination.  Id. at 581-82.  That same month, West spent four days in the hospital after another episode of severe abdominal pain.  Id. at 1554. Dr. William Schuh diagnosed her with recurrent pancreatitis, and gave her morphine for pain and insulin to help control her diabetes.  Id.

In August 2004, Dr. Syed wrote a letter to the state agency, explaining that West's chronic pancreatitis and diabetes were responsible for her recent

hospitalizations. He also noted that her condition was a "financial burden." Id. at 509. Dr. Mirell, West's psychologist, also provided the state agency with an evaluation of West. Dr. Mirell stated that West met Listings 12.04 and 12.06. Id. at 514. Specifically, under Listing 12.04 Dr. Mirell indicated that West had marked difficulties in social functioning and in maintaining concentration, persistence or pace. Id. at 515. Under Listing 12.06, Dr. Mirell found that West had recurrent panic attacks, affecting her ability to maintain social functioning and concentration. Id. at 516.

In January 2005, West went to the emergency room complaining of abdominal pain. Id. at 1555. She spent four days in the hospital. Id. at 1558. She was given morphine and Phenergan, which temporarily relieved West's pain. Id. at 1555. The doctors put her on a diet to help control her diabetes, and discharged her. Id. at 1558.

West was hospitalized twice in February 2005. She was admitted on February 3, 2005, for pancreatitis and poorly controlled diabetes, and discharged on February 5, 2005, in stable condition. Id. at 1619. She was readmitted on February 11, 2005, with abdominal pain. Id. at 1654. She indicated that she had celebrated her twenty-first birthday with several alcoholic drinks the night before, and she tested positive for amphetamines,

benzodiazepines, and cannabis.  Id.  She also tested positive for pregnancy. Id.  She was discharged six days later, on February 17, 2005.  Id. at 1657.

In April 2005, West was admitted to Carle Hospital.  Id. at 1836.  Dr. John Peterson noted that West had been hospitalized six times since January due to her chronic pancreatitis, including in March 2005.  Id.  Dr. Peterson noted that West was "agitated with screaming, crying, and rocking the bed back and forth."  Id.  Dr. Peterson gave West morphine for her pain, but West was so agitated that the nurses had difficulty getting an IV going; West managed to punch one of the nurses and was "extremely uncooperative."  Id. at 1836, 536.

The next month, West was taken to the hospital via ambulance after an argument with a friend left her so upset that West was threatening to kill herself.  Id. at 529.  She denied that she had been using illegal drugs, but tested positive for cocaine and cannabis.  Id.  West was on probation for a drug offense and was assisting law enforcement, according to her mother, but doctors were concerned about West's substance abuse, and also thought she should seek psychological treatment.  Id.

West visited Dr. Georgia L. Cuddeback in August 2005 for a psychological evaluation at the request of the state agency.  Id. at 550.  Dr.

Cuddeback indicated that West had been hospitalized twenty times since January 2005, and that she was preparing to undergo treatment for cervical cancer.  Id. at 551.  West said that she did chores around her parents' house, like vacuuming, washing dishes, and laundry.  Id. at 552.  Dr. Cuddeback found that West was "severely depressed with suicidal ideation," and that she had no job skills due to her lack of employment history.  Id. at 553.  Dr. Cuddeback found that West's drug problem was in remission, and gave her a GAF score of 52.  Id. at 553.

The state agency had West evaluated by nurse Harriet Steahly on October 20, 2005.  West told Steahly, "I just don't know what it feels like to feel well.  I never feel good."  Id. at 112.  West was taking Wellbutrin for depression and Klonopin for anxiety attacks.  Id.  Because she had no income, West moved back in with her parents; her financial problems also lead her to go to the emergency room for treatment if she ran out of insulin.  Id.  She admitted to smoking marijuana and crack cocaine in the past, but stated that she had quit using marijuana months ago and had not used crack for almost one month.  Id.  Steahly noted that West had a long history of serious medical problems, including depression.  Id. at 112-13.

Also in October 2005, the state agency completed a Psychiatric Review

Technique form on West, finding that she had impairments that fell under Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders), but that these impairments were not severe and did not equal or exceed the listing criteria.  Id. at 567.

A Residual Functional Capacity (RFC) Assessment form from December 2005 indicates that West could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for six of the eight hours in a work day, sit for six of the eight hours in a work day, and had an unlimited ability to push and/or pull.  Id. at 560.  That same month, Dr. N.L. Still examined West and found her to be an "extremely reliable" historian.  Id. at 554.  She admitted to using drugs, but said she had quit since the positive test in May.  Id. at 555.  His examination revealed that she was five feet, seven inches tall, and weighed 145 pounds.  Id. at 556.  Dr. Still opined that until West's diabetes was regulated, she would not be able to do anything except sedentary work.  Id. at 558.

Throughout 2006, West was in and out of the hospital, mostly for issues relating to her pregnancy.  Her son was born on September 11, 2006, via Caesarean section.  Id. at 634-76.  In May 2007, West was again hospitalized after she had a miscarriage.

West visited several doctors in August 2007.  Dr. Stuart King noted that West had not been compliant with her medication regimen because she had been out of town.  Id. at 1324.  He thought West was "sincere" and that she had "legitimate pain."  Id.  Dr. King had West take a drug test on August 22, 2007, expecting it to be positive for Vicodin/hydrocodone (an opiate) and lorazepam (a benzodiazepine); he made sure West knew that street drugs were not allowed, and that he had a zero-tolerance policy for illegal drug use.  Id.

That same month, West saw Dr. Kenneth Gilbert, a psychiatrist.  Id. at 1391.  Dr. Gilbert noted that both of West's parents were taking anti-depressant medication.  Id.  Dr. Gilbert indicated that West did not seem sad at the examination, and that she denied using alcohol or street drugs. Id.  He prescribed her Cymbalta and a refill of her lorazepam.  Id. at 1392.

In November 2007, West met with Jill Cochennour in Dr. Gilbert's office, complaining of panic attacks at night.  Id. at 1393.  On December 12, 2007, she again met with Dr. Gilbert, and complained again of panic attacks.  Id. at 1388.  He prescribed her Remeron to help deal with her panic attacks, and to help her sleep at night.  Id.

In February 2008, West traveled to Washington University in St.

Louis to meet with doctors in the School of Medicine. Id. at 1398. Dr. Elbert Kuo and Dr. William Hawkins examined West. Her weight was up to 171 pounds. An MRI was done which revealed that only a small portion of her pancreas remained. Id. at 1398. Dr. Kuo noted that the only viable surgical option was a total pancreatectomy. However, he also indicated that over time her pancreas would "burn out" and the pain would improve. Id.

Dr. Gilbert saw West again in February 2008. West complained of panic attacks, crying spells, and depression. Id. at 2016. Dr. Gilbert noted that West did not benefit from serotonin re-uptake inhibitor medication. Id. However, she appeared pleasant and seemed focused on being able to take care of her son. Id.

Additionally, West saw Dr. Hawkins on June 20, 2008, at Barnes Jewish Hospital. Dr. Hawkins described her as a "very unfortunate young woman" who had suffered from chronic pain for years. Id. at 2274. None of the treatment options had been successful, and the doctors had removed West's pancreas. Dr. Hawkins noted that she was still in severe pain, even after they had removed her pancreas, and that she had lost fifteen pounds and was having trouble eating. He mentioned that West was listless and needed assistance to care for her child. Id. He concluded by saying that,

while he expected her condition to improve eventually, he did not think she would be able to hold down a job for many months to come.  Id.

In sum, the record shows that West was hospitalized for issues relating to her pancreatitis on at least the following occasions: January 1-3, 2004; February 13-15, 2004; March 11, 2004; April 6-11, 2004; July 14-15, 2004; November 3, 2004; January 6-10, 2005; February 3-5, 2005; February 11-17, 2005; April 4-5, 2005; June 12, 2007; September 16, 2007; March 31, 2008; and April 24, 2008.

IV.  ADMINISTRATIVE HISTORY

West applied for SSI on January 27, 2004.  Tr. at 14.  The SSA denied West's application initially and upon reconsideration.  Id.  She then on January 25, 2006, filed a request for a hearing before an ALJ.  Id.  On April 7, 2008, ALJ David Thompson held a video hearing on West's claim. She was in Springfield, Illinois, and the ALJ was in Peoria, Illinois.  Id. at 2323.  Dr. James Lanier, a vocational expert, and Deborah Sue West, Stephanie West's mother, were also part of the video conference.  Id.

West testified at the hearing.  She stated that she had an eighteen-month-old son, and lived with her parents.  Id. at 2327.  West completed her tenth grade year of high school, and said she wanted to obtain a GED,

but that her illness kept getting in her way.  Id. at 2328.  West said that she used food stamps to buy groceries and had a state medical card for herself and her son.  Id. at 2328.  West's last job was at Wal-Mart in 2002, where she earned $700 over the course of the year.  Id.  She said that she had to stop working because she felt sick all the time, was in severe pain, and frequently vomited.  Id. at 2329.  When asked why she had not worked since 2002, West said, "I'm not able to, sir.  I don't believe I'm able to.  I'm always sick.  I barely ever have a good day."  Id.

Despite the number of medications she takes, West testified that she was always in a great deal of pain, and that her doctors were still trying to figure out the appropriate dosages of her pain medications.  Id. at 2330.  West added that her diabetes was also problematic, and that she was working with her doctor to determine the proper dosage of insulin to help regulate her blood sugar levels.  She stated that she frequently felt nauseated and lethargic, and that her father often had to help her care for her son.  Id.

The ALJ asked West about her illegal substance abuse:

Q:  Now ma'am a major concern I have in reviewing your file is your repeated abuse of drugs.  Went through '07 I've got positive results for opiates in two tests.  You were clean on two other tests.  The only other report I have is dated '05, May of '05.  And, that found you, it looks like

you had pot, cocaine, meth, opiates all together.

A:    I have had my experiences with drugs.  I guess I, it's no excuse, but I tried to hide my physical problems behind drugs.  But I am no longer doing drugs.  And I have passed all my pain management drug testing that they're giving me monthly.

Id. at 2331.  West testified that she used drugs from the time she was sixteen years old until she was eighteen years old.  Id. at 2332.  The ALJ questioned her about a test in 2007 showing that West tested positive for opiates.  West did not know what an "opiate" was, and responded that she "could have slipped up a couple times," but reiterated that she had not used illegal drugs at least since she started pain management at the beginning of 2008.  Id. at 2332.

West testified that the illegal drugs were a way for her to cope with the stress of being in and out of the hospital throughout her life.  Id. at 2333. The ALJ noted that he had not "found that many hospital stays for more than one day," and West indicated that there should be other records in the file showing hospitalizations at Children's Hospital, Barnes Jewish Hospital in St. Louis, Missouri, and Provena Covenant Medical Center in Urbana, Illinois.  Id. at 2333-35.  West noted that her drug abuse probably made her diabetes and pancreatitis worse.  She was involved in a drug rehabilitation

15

program in 2001, but stated that she was finished doing illegal drugs because she had a son, and because she had too much ahead of her.  Id. at 2336.

West testified that she was unable to work because of the pain and vomiting.  Id. at 2338.  The ALJ provided her with a pain scale, and asked her to assess her pain.  Id.  West stated that on an average day, her pain registered as an "eight," with "ten" being the most excruciating pain imaginable.  Id. at 2339.  On a good day, she was a "six," but said that she was always in pain.  On a bad day, West testified that her pain was a "ten," and that she had about three good days a month, three average days a month, and that the balance were bad days.  Id.  She stated that she would only go to the emergency room if she could not bear the pain any longer, out of concern from being away from her son.  Id. at 2340.  West said that she was "always depressed."  Id.  However, she said that on a good day she could walk about a mile and lift her twenty-four pound son, but that she had trouble bending over or going up stairs if her stomach really hurt.  Id. at 2341-42.

Finally, West talked about her daily activities.  She has a driver's license, but said that she mainly drives back and forth from doctors'

appointments.  West testified that she smokes cigarettes, and that she is able to take care of herself and her son, and do laundry, dishes, and cleaning on good days.  Id. at 2343-44.  She stated that her mother does the grocery shopping, and that she watches television five hours a day and reads occasionally.  Id. at 2344.  West testified that she visits friends or family once a month, and that she is able to take care of her son about fifty percent of the time.  Id. at 2345-46.

Deborah Sue West, Stephanie West's mother, testified that her daughter "lives in the Emergency Room."  Id. at 2350.  Deborah Sue West stated that Stephanie West is "in pain every day," and that she oftentimes has difficulty caring for her son because of the pain.  Id.  Deborah Sue West stated that Stephanie had most recently been in the emergency room the previous Sunday, and that she has had pancreatitis since she was thirteen years old.  Id. at 2350-51.  West's mother testified that Stephanie was scheduled to see a physician at Washington University in St. Louis regarding having her pancreas removed, but that doing so would result in West's diabetes becoming worse.  Id. at 2351-52.  Deborah Sue West stated that her daughter is often depressed, and that Stephanie West has at most five relatively "good days" a month.  Id. at 2352-53.  Finally, West's mother

testified that Stephanie's drug abuse is a thing of the past.  Id. at 2353.

Dr. Lanier, the vocational expert, testified that he was familiar with the jobs available in the State of Illinois, and that a hypothetical person with West's age, education, and experience who was limited to light work would be able to perform West's past jobs of retail cashier, sales person, general merchandise, fast food worker, and hostess.  Id. at 2355.  Dr. Lanier stated that West's past work as a material handler would not be feasible given her ability to only perform light work.  Id.  The ALJ and Dr. Lanier engaged in the following exchange:

> Q:    If I were to add to the hypothetical the individual is going
>       to miss four or more days [of work] per month, how would
>       that affect employability?
>
> A:    The person would not be a mainstay in the workforce.

Id. at 2355.  Dr. Lanier also testified that an employer probably would not allow an individual to take multiple unscheduled breaks on a regular basis. Id. at 2356-57.

## V.    THE ALJ'S DECISION

The ALJ issued a written Decision denying West's claim on May 27, 2008.  Tr. at 11.  The ALJ noted that he cannot consider an individual to be disabled for Social Security purposes if drug addiction or alcoholism is a

"material factor" contributing to disability. Id. at 14. Such substance abuse is "material" if the individual would not be disabled but for her usage of drugs or alcohol. Id. The ALJ noted that he first would have to go through the mandatory five-step process for determining disability considering all of West's impairments, including what he characterized as her substance addiction disorder. Id. at 15. If he found her to be disabled, he would have to go through the process again to see whether she was disabled independent of any substance abuse. Id.

The ALJ found that West had not engaged in "substantial gainful activity" since January 27, 2004, and that her diabetes mellitus, pancreatitis associated with cystic fibrosis, depression, and substance addiction disorder were "severe impairments." Id. at 16. However, the ALJ determined that none of these impairments met or medically equaled the relevant impairment Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ recognized that West used medication to help manage her pain, blood sugar, and depression; these medications included opiates. Id. at 17. He indicated that her symptoms were vomiting and severe abdominal pain associated with pancreatitis. Id. However, he pointed out that West had tested positive for cannabis, cocaine, methamphetamine, and opiates on

three occasions: July 2005, August 2007, and December 2007.  Her drug tests were negative in August, October, and November 2007.  Id.

The ALJ noted that West could lift up to twenty-four pounds and that she was able to drive and help out around the house.  Id. at 17.  Further, he asserted that West "alleges multiple hospitalizations for her problems, but the record shows only one hospitalization . . . . The only hospital stay confirmed by the medical evidence of record occurred in May 2007 for cleanup after a miscarriage." Id.  Although Dr. Syed reported that West had been hospitalized many times for treatment, the ALJ pointed out that these hospitalizations occurred prior to West's application for SSI.  Id. at 18.

In addressing West's depression, the ALJ discounted the analysis of psychologist Dr. Mirell, who had found that West met the criteria in Listings 12.04 and 12.06, because Dr. Mirell's findings were four years old and more recent treatment notes from Dr. Gilbert indicated that West's anxiety and depression were improving because of medication.  Id. at 18. The ALJ found that West's drug use impeded her ability to function, and that her difficulties in daily life and social functioning were mild to moderate, but not marked, unless she was using drugs.  Id.  Additionally, the ALJ noted that West had not experienced any periods of

decompensation.  Id. at 19.  The ALJ summarily found that West's mild

retinopathy associated with her diabetes was insufficient to meet Listing

9.08, and that her pancreatitis did not meet Listings 5.02 through 5.08.  Id.

In terms of West's RFC, the ALJ determined that West could perform

light work even when she was abusing drugs, "except she would miss more

[sic] four or more days of work per month in addition to being unable to

perform moderately complex or detailed tasks" when using drugs.  Id. at 19.

He found specifically that the medical evidence did not support West's

"allegation of disability" based on pain because she still had normal range

of motion and did not have muscle atrophy or "reflex abnormalities

associated with intense and disabling pain."  Id.  The ALJ also noted that

West's ability to engage in household tasks, leisure activities, and care for

her son was inconsistent with complete disability.  Id. at 20.  He found that

no medical evidence supported West's assertion that she was unable to

work, and that she could lift at least twenty-four pounds occasionally, ten

pounds frequently, and walk, stand, and sit for two hours at a time during

a six- to eight-hour work day.  Id.  "When the claimant abuses drugs," the

ALJ wrote, "she would miss work four or more days per month."  Id.  Thus,

according to Dr. Lanier, West did not have the RFC to perform past work

when abusing drugs; otherwise, she could return to past work.  Id. at 20-21.

West appealed, but the Appeals Council denied her request on December 12, 2008.  Id. at 6.  She then filed this lawsuit.

## ANALYSIS

West seeks review of the ALJ's Decision on two grounds.  First, she argues that the ALJ improperly focused on her illegal drug use instead of looking at the severity of her physical and mental illnesses.  Next, West argues that the frequency with which she attends doctors' appointments or has to go to the hospital preclude her from working.

Judicial review of the Commissioner's final determination of disability is limited, and the Commissioner's findings of fact are treated as conclusive as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); Halbrook v. Chater, 925 F.Supp. 563, 571 (N.D. Ill. 1996).  "Substantial evidence" means evidence that "a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).  On review, courts may not reevaluate evidence, make new factual determinations, or substitute their judgment for that of the Commissioner.  Powers, 207 F.3d at 434-35.  However, when the Commissioner's Decision "lacks evidentiary support,"

the court should remand the case.  <u>Steele v. Barnhart</u>, 290 F.3d 936, 940 (7th Cir. 2002).

The court must look to the record as a whole to determine if there is "substantial evidence" supporting for the ALJ's Decision.  <u>Stephens v. Heckler</u>, 766 F.2d 284, 287 (7th Cir. 1985).  An ALJ's opinion need not evaluate "every piece of testimony and evidence submitted."  <u>Zalewski v. Heckler</u>, 760 F.2d 160, 166 (7th Cir. 1985).  All that is required is that the ALJ "considered the important evidence" in the opinion, thus allowing the courts to "trace the path of the ALJ's reasoning."  <u>Stephens</u>, 766 F.2d at 287.

In determining whether an individual is disabled for Social Security purposes, the ALJ must use the five-step sequence outlined in 20 C.F.R. § 416.920(a).  Each step must be satisfied before moving on to the next step. First, the ALJ determines if the claimant engages in "substantial gainful activity," (SGA) defined as work that involves significant physical or mental activities, usually done for pay or profit.  20 C.F.R. §§ 416.920(b), 416.972(a)-(b).  If the claimant is not involved in SGA, Step 2 requires the ALJ to decide whether the claimant has a medically determinable impairment that is "severe," or a combination of impairments that, taken

together, are "severe." 20 C.F.R. § 416.920(c). Severity is measured by whether an impairment significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 416.921; SSRs 85-28, 96-3p, 96-4p. If such an impairment is found, the ALJ proceeds to Step 3.

In Step 3, the ALJ evaluates whether the claimant's impairment meets or is equal to the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the ALJ decides in the affirmative, the claimant is disabled. If the claimant's condition is not equivalent to a Listing, the ALJ moves on to Step 4. Step 4 requires the ALJ to determine the claimant's RFC. The ALJ considers all impairments, not just those found to be severe under Step 2. 20 C.F.R. § 416.945. The ALJ then determines whether the claimant has the RFC to perform past relevant work.

If the claimant is not able to perform past relevant work, the ALJ moves to Step 5, where he evaluates whether the claimant is capable of performing other work. 20 C.F.R. § 416.920(g). The ALJ takes into consideration the claimant's RFC, age, education, and work experience. At this juncture, the SSA is responsible for producing evidence that demonstrates that there is work suitable for the claimant in the national economy. 20 C.F.R. §§ 416.912(g), 416.960(c). If the ALJ determines that

there is other work available to the claimant, the claimant is not disabled for Social Security purposes.

With these standards in mind and for the reasons described below, the Court finds that the ALJ's Decision was not supported by substantial evidence.

I.  <u>IMPROPER FOCUS ON ILLEGAL DRUG USE</u>

The ALJ found that West was not engaged in substantial gainful activity since the date of her application, January 27, 2004.  He next found that she had severe impairments -- diabetes mellitus, pancreatitis associated with cystic fibrosis, depression, and substance addiction disorder.  At Step 3 of the analysis, he found that West's impairments did not meet or medically exceed one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ next found that West, when not abusing drugs, had the RFC to perform light work, other than moderately complex or detailed tasks.  When West abused drugs, the ALJ also found that West could perform light duty work, with the same restrictions as stated above, except she would miss four or more days of work per month.  The ALJ finally found that, when considering the effects of a substance addition disorder, West was unable to perform past relevant work.

West first argues that the ALJ failed to address her serious medical problems and instead dedicated an inappropriate amount of space in his Decision to discussing her past drug abuse. The Commissioner counters that West's drug abuse was significant, and that there is substantial evidence supporting the ALJ's findings.

As far as West's physical illnesses go, the Court agrees with her. The ALJ's characterization of Plaintiff's medical history is puzzling, particularly his statement that West's medical records show only one multi-day hospitalization during the relevant period. This conclusion is wholly unsupported by any evidence, let alone substantial evidence: The nearly 2400 pages of medical records in this case show at least eight multi-day hospitalizations, excluding those related to West's pregnancy, the birth of her son, and her later miscarriage.

The ALJ summarily stated that "[p]ancreatitis has not been associated a disorder described in section 5.02-5.08 of the listing of impairments." Tr. at 19. While it is true that there is no listing dedicated solely to pancreatitis, the ALJ failed to consider whether West's illness could medically equal "analogous listed impairments." See 20 C.F.R. §§ 416.925(c)(5), 416.926(b)(2). The ALJ provides no evidence or reasoning

to support his conclusion that West "does not have an impairment that meets or equals" a listed impairment. Id. at 19. Although an ALJ's opinion need not be perfectly clear, at the very least the path of his reasoning must be evident; in this case, it is not.

Nonetheless, the ALJ's determinations regarding West's mental illnesses are supported by substantial evidence. Dr. Mirell, one of West's former treating psychologists, found that West met the criteria in Listings 12.04 and 12.06. The ALJ explained that he discounted Dr. Mirell's findings because they were made several years before West's hearing, and that more recent evidence from Dr. Gilbert demonstrated that West's mental conditions were improving. Id. at 18. Additionally, state agency physicians found that West did not meet the criteria in Listings 12.04 and 12.06. The ALJ walked through the "Paragraph B" and "Paragraph C" criteria in Listings 12.04 and 12.06, and concluded that West's restrictions and limitations were not "marked," and that she had not had any episodes of decompensation. Id. at 18-19. This determination is supported by substantial evidence, and the Court will not disturb it.

Therefore, while substantial evidence supports the ALJ's Decision regarding West's mental illnesses, there is not substantial evidence

supporting the ALJ's determination with regard to her physical medical problems, particularly her pancreatitis in combination with diabetes. Accordingly, the ALJ's Decision on that ground is reversed, and a new hearing must be held on whether West's pancreatitis meets or equals impairment listing criteria.

## II.   FREQUENCY OF DOCTORS' APPOINTMENTS

West's next argument is essentially that the ALJ erred in assessing her RFC, and ignored the volume of medical evidence in the record.   The Commissioner counters that hospital visits alone do not establish disability for SSI purposes.

The ALJ's RFC determination is not supported by substantial evidence.   He found that West had the RFC to perform light work "when not abusing drugs," and the RFC to perform light work when abusing drugs except that "she would miss four or more days of work per month . . . ."  Tr. at 19.   Throughout his opinion, the ALJ characterizes West as a chronic abuser of illegal substances; the record shows that this characterization is not supported by substantial evidence.   While there is evidence that West did use illegal drugs in the past, the record is clear that the vast majority of this usage occurred before she filed for SSI in January 2004.

The February and May 2005, drug tests are the only ones in the record showing that West tested positive for illegal substances. The ALJ makes much of the fact that West tested positive for opiates in 2007, but as treatment notes in conjunction with these tests demonstrate, the positive tests were a result of prescription medication West was taking as part of her pain management regimen. See, e.g., id. at 1324. As far as West's "admission" that she may have "slipped up" a few times when questioned about her 2007 positive drug tests goes, the context of this statement shows that West did not know what an "opiate" was: In response to his question, she asked, "What's opiates?" Id. at 2332. Also, as mentioned above, it was no surprise to West or her physicians that she tested positive for opiates, because they had prescribed her opium derivatives for pain management. Dr. King made it clear to West that he had a zero-tolerance policy for street drugs; had West's tests shown abuse of illegal street drugs, Dr. King's notes would have reflected it, and West would have been booted from the program. Id. at 1324.

The ALJ's characterization of West as an illegal substance abuser is important because it was material to his RFC determination. He determined that West's "substance addiction disorder" was a material fact

in his Decision.  Id. at 21.  Specifically, the ALJ relied on Dr. Lanier's testimony that someone who missed four or more days of work per month would not be a "mainstay" in the workforce.  Id. at 21, 2355.  The ALJ concluded that the "effects of a substance addiction disorder" would cause West to miss more than four days of work per month.  Id.  However, when West was not abusing drugs, the ALJ determined that she had the RFC to perform light work.  Id. at 21.

The ALJ's determination that West's "substance addiction disorder" would cause her to miss four or more days of work per month is not supported by substantial evidence.  There is no evidence in the record that West would need to miss work for four or more days because of a "substance addiction disorder."  There is not substantial evidence showing that West was hospitalized or laid up solely because she had been using illegal drugs.  Instead, the bulk of the evidence shows multiple multi-day hospitalizations for treatment of chronic pancreatitis and brittle diabetes, and that West attended a multitude of doctors' appointments.  By the ALJ's own terms, if West had to miss four or more days of work per month because of medical issues or doctors' appointments, she would be unable to perform past relevant work, and would be disabled for Social Security

purposes. The ALJ's conclusion that West would miss four or more days of work because of a "substance addiction disorder" is not supported by substantial evidence, and this matter must be reversed and remanded for a new hearing on West's RFC.

THEREFORE, Plaintiff's Motion for Summary Judgment (d/e 12) is GRANTED. The Commissioner's Motion for Summary Affirmance (d/e 16) is DENIED, and his Decision is REVERSED to the extent outlined above. This matter is remanded pursuant to 42 U.S.C. § 405(g), Sentence 4, for a re-hearing on whether West's pancreatitis in combination with diabetes medically equals relevant listing criteria, and for a determination of West's RFC that takes into account the entire record. All other pending motions are DENIED as MOOT. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER: November 23, 2009

      FOR THE COURT:

              _____ s/ Jeanne E. Scott _____
              JEANNE E. SCOTT
              UNITED STATES DISTRICT JUDGE